NOT FOR PUBLICATION

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

| | | |
|---|---|---|
| ERIC POTTER, | : | Civ. No. 15-8784 (FLW) |
| | : | |
| Petitioner, | : | |
| | : | **OPINION** |
| v. | : | |
| | : | |
| THE ATTORNEY GENERAL OF THE | : | |
| STATE OF NEW JERSEY, *et al.*, | : | |
| | : | |
| Respondents. | : | |

**FREDA L. WOLFSON, U.S.D.J.**

## I.     INTRODCUTION

Before the Court is the Petition for a writ of habeas corpus by Petitioner Eric Potter,

("Petitioner" or "Potter") brought pursuant to 28 U.S.C. § 2254. (ECF No.1.) For the reasons set

forth below, Petitioner's habeas petition is DENIED, and Petitioner is DENIED a certificate of

appealability.

## II.     BACKGROUND

### A.  Factual Background

The relevant facts are set forth in the opinion of the Superior Court of New Jersey,

Appellate Division, on Petitioner's direct appeal:

> On the evening of April 26, 2010, Officer Eddy Raisin of the Street
> Crimes Unit (Unit) of the Asbury Park Police Department met with
> a confidential informant who had provided reliable information in
> the past. The informant told him that Potter was known to walk
> from the Vita Garden Apartments in Asbury Park during the early
> morning hours to a house on Bangs Avenue, where he would play
> poker on the second floor and sell heroin. To reach Bangs Avenue,

he would cut through a municipal basketball court. The informant provided a physical description of Potter.

Shortly before 10:00 a.m., on April 27, Raisin met at police headquarters with other members of his Unit, including Lieutenant David Desane, Officer Lorenzo Pettway, Officer Adam Mendes, and Officer Kamil Warraich, as well as members of the Monmouth County Narcotics Strike Force, including Detectives Todd Rue, Scott Samis, and Christopher Camilleri. After the meeting, they set up surveillance sites at the basketball court, Bangs Avenue, and the street connecting the two, using unmarked police cars.

Warraich and Camilleri's vehicle was in a parking lot near the basketball courts. Raisin and Mendes were on the connecting street and had a clear view of the basketball courts. Desane, Samis, and Pettway positioned their vehicle so they could view the house on Bangs Avenue, but they could not observe the basketball court from their location.

At approximately 11:40 a.m., Raisin observed a man matching Potter's description heading from the Vita Garden Apartments toward the basketball courts. Raisin immediately told Warraich to drive toward the basketball courts and approach Potter.

Warraich and Camilleri left the parking lot, drove closer to the courts, and parked. They got out of the vehicle and approached Potter. While doing so, Warraich positioned himself to Potter's right side and Camilleri positioned himself to the left. Warraich asked Potter for his name and what he was doing in the area.

Before Potter answered, Warraich observed a clear, "Ziploc[-]type" plastic bag in the front right pocket of Potter's jacket. Although the bag was inside the pocket, it was visible because the bag created a bulge that kept the pocket open. Warraich could also see the packages in the bag, which were wrapped in paper and shaped like a small brick.

Based on his training and experience, including having "seen plenty of bricks of heroin," Warraich concluded that the bag contained drugs. Warraich immediately placed Potter under arrest and removed the plastic bag from his pocket. The bag contained several bricks of what was subsequently identified as heroin. A search incident to the arrest uncovered a second plastic bag in Potter's left pocket that also contained several bricks of what proved to be heroin. Nine unbundled packets of heroin were also recovered. Following his arrest, Potter was transported to police headquarters,

where another search revealed that Potter was carrying $1520 in cash.

Warraich turned the plastic bags and nine loose packets over to Officer Raisin. In his investigation report, Raisin recorded his inventory of the two bags. One of them contained 498 glassine packets, 298 of which bore the stamp "Candy Girl," 150 of which were stamped "Extra Power," and 50 of which were stamped "Knockout." The other bag held 350 glassine packets, 150 of which were stamped "Candy Girl," 150 of which bore the stamp "Extra Power," and 50 of which were stamped "Knockout."

At police headquarters, Potter was interviewed by Samis and Raisin. The interview was videotaped and transcribed. Before the start of the interview, Samis informed Potter of his *Miranda* rights. Potter initialed a *Miranda* form acknowledging, among other things, that he was waiving his right to remain silent, his right to consult with an attorney, and his right to have one present during the interview. Potter also acknowledged that he had been informed that his decision to waive his rights was not final and could be revoked at any time during the interview.

During the interview, Potter admitted that he was told by another person to pick up the two bags and deliver them to someone he did not identify. There was one buyer for the larger bag for $2500 and another for the smaller bags for around $1800. Potter expected to receive $300 for facilitating the transactions. He told the officers that he had four or five customers and was averaging a couple of bundles a day in sales. He also asserted that the quantity he had with him that day was a lot more than he usually sold. Potter maintained that he used the money to buy food and support himself.

At the end of the interview, Samis told Potter that they would "let [him] make phone calls" once they found out what the bail amount would be. According to Samis, Potter had not asked to make a phone call prior to that exchange.

*State v. Potter*, Indictment No. A-1175-12T3, 2015 WL 3843309, at *1–2 (N.J. Super. Ct. App. Div. June 23, 2015) (footnotes omitted).

## B. Procedural History

Following a jury trial, Petitioner was convicted of:

[T]hird-degree possession of a controlled dangerous substance, N.J.S.A. 2C:35–10(a)(1) (count one); second-degree possession of heroin in a quantity of one-half ounce or more with the intent to distribute, N.J.S.A. 2C:35–5(b)(2) (count two); and third-degree possession of heroin with the intent to distribute within 1000 feet of a school, N.J.S.A. 2C:35–7 (count three).

. . .

[The sentencing judge] imposed a sentence of fifteen years in prison with seven-and-one-half years of parole ineligibility pursuant to N.J.S.A. 2C:43–6(f).

*Id.* at *1–4.

Prior to trial, Petitioner filed several motions:

On December 16, Potter filed a motion seeking to represent himself.

. . .

The judge ultimately allowed Potter to proceed *pro se*, but with standby counsel.

Potter's attorney had filed a motion to suppress the evidence seized on the day of his arrest. The judge heard some testimony on that issue on April 14. Warraich and Raisin testified for the State. The judge then adjourned the hearing pending disposition of Potter's motion to compel production of the personnel records of certain members of the Asbury Park Police Department and the Monmouth County Prosecutor's Office. That motion was denied on May 12.

The motion to suppress resumed on May 26, with testimony by Camilleri, Samis, Rue, and others. On July 19, following the presentation of additional evidence, the judge placed an oral decision on the record. She found that both Warraich and Camilleri were credible witnesses, and that Warraich was very knowledgeable about the packaging of narcotics. She concluded that Warraich had sufficient reasonable suspicion to warrant an investigative stop. The judge found that Warraich observed Potter carrying drugs in plain view when he sought to question him, which provided probable cause for the arrest and the subsequent search.

Potter filed a motion to dismiss the indictment on August 25. The judge assigned to conduct the trial heard oral argument on the

motion on November 3, and issued a written decision and order denying the motion six days later.

On December 2, Potter filed a motion to suppress the statements he made to the police following his arrest, arguing (1) that the police coerced him to make the statement through a promise; (2) that he was suffering from heroin withdrawal at the time; and (3) that he did not know he was being videotaped.

The trial judge conducted a hearing on that motion on March 13, 2012. The following day, he issued an order and a written decision. The judge concluded (1) that Potter had failed to present evidence of the existence of any promise, much less a promise that overbore his will, (2) that there was no evidence presented that he was suffering from heroin withdrawal, and (3) that Potter had no privacy right with respect to his statement because he had been told it would be recorded, if not videotaped.

*Id.* at *2–3.

Petitioner appealed his conviction and sentence. The Appellate Division affirmed on June 23, 2015. *Id.* The New Jersey Supreme Court denied certification on November 6, 2015.[1] *State v. Potter*, 125 A.3d 391 (N.J. 2015). In December 2015, Petitioner filed a habeas petition with this Court raising eleven grounds for habeas relief:

1. The defendant's right to be free from unreasonable searches and seizures as guar[a]nteed by the [F]ourth [A]mendment to the United States Constitution and Art.1, Par.7 of the New Jersey Cons[t]itution was violated by the unlawful detention and the search of the defendant. [T]he police officer[]s detained the defendant on the basis of information from a confidential informant that the police, not the courts decided was reliable without any corroboration to stop and detain and to [] search the defendant. Without any reasonable suspicion that the defendant committed a crime. The trial judge that decided the suppression motion ruled that the stop was a[n] investigative stop.

2. The defendant's State and Federal Cons[t]itutional Right To A Grand Jury Indictment was Violated, and the trial court erroneously denied the defendant's motion to dismiss the indictment on those grounds. The defendant moved to dismiss the indictment on the grounds that the state merely proffered hearsay evidence when it could have produced the arresting officer. Moreover, the indictment was in fact defic[i]ent in providing the defendant notice. Once the defendant received his discovery he discovered that the indictment was under indictment No. 10-8-1447 but that the indictment [N]o. on the grand

---

[1] Petitioner does not appear to have filed a petition for post-conviction relief.

jury transcri[p]ts was 10-7-1307. The defendant also discovered some other documents with the indictment 10-8-1447 with another defendant's name on it. And that the indictment: No. 10-7-1307 belong[ed] to someone else.

3.  The instructions to the jury by the trial judge exceeded the bounds of fair comment and constituted prejudicial error and denied the defendant the right to a fair trial under the [S]ixth [A]mendment of the United States Constitution and the Fourteenth Amendment of the United States [Constitution]. And the New Jersey Constitution of 1947. The trial judge during trial instructed the jury that they were not to consider why the officer[]s stopped the defendant and that another judge had already ruled that the stop of the defendant was legal.

4.  The defendant's right to due process of law as guar[a]nteed by the Fourteenth Amendment to the United States Constitution and Art. 1, Par. 1 of the New Jersey constitution was violated by the trial[] court['s] erroneous instruction on the law pertaining to the quan[t]ity requirement for a second degree intent to distribute CDS crime.

5.  The defendant's right to confrontation as guaranteed by the Sixth Amendment to the United States Constitution and Art. 1, Par. 10 of [the] New Jersey [Constitution] and the defendant's right to due process of law as guaranteed by the Fourteenth Amendment to the United States Constitution and Art. 1, Par.1 of the New Je[rs]ey Constitution were violated by the admission of acc[u]sations from absentee witnesses about prior crimes allegedly committed by the defendant when the state introduced evidence showing that a narcotics officer that was working with the prosecutor's office and was later transfer[r]ed to the DEA had the defendant under surveillance.

6.  The defendant's right to due process of law as guaranteed by the Fourteenth Amendment to the United States Constitution and Art.1, Par.1 of the New Jersey Constitution was violated by Prosecutorial Misconduct when the prosecutor made it clear to the jury, however, that the defendant was engaged in a continuing enterprise. The prosecutor argued that you can basically see a business model for this defendant.

7.  The defendant's right to due process of law as guaranteed by the Fourteenth Amendment of the United States Constitution and Art.1, Par.1 of the New Jersey Constitution was violated by the improper admission of the state's expert witness testimony concerning matters well within the ken of the average juror when the expert witness rendered an expert conclusion that the CDS in this case was possessed with the intent to distribute. The expert improperly rendered an expert opinion concerning the guilt of the defendant on the charge of possession with the intent to distribute.

8.  The defendant's right to due process of law as guaranteed by the Fourteenth Amendment to the United States Constitution and Art.1, Par.1 of the New Jersey Cons[t]itution was violated when the trial court expressly disavowed its obligation to ensure a fair trial, resulting in unfair prejudice when the juror[]s heard allegations by a state[']s witness that the defendant was dealing drugs night and day, and that purported fact was false.

9. The defendant's right to due process of law as guaranteed by the Fourteenth Amendment of the United States Constitution and Art.1, Par.1 of the New Jersey Constitu[t]ion was violated when the state['] s lay witness rendered highly prejudicial opinions that should have been exc[lu]ded when the officer testified before the jury that he premised on his own personal belief that drugs that w[ere] not tested by the lab chemist was in fact her[oi]n.

10. The State failed to prove beyond a reasonable doubt that the defendant's waiver of his *Miranda* Rights had been made knowingly and voluntarily. The police deprived the defendant the opportunity to consult with an attorney before giving an incriminating confession. The officer did concede that the defendant asked him to make a phone call, but the officer told the defendant that he could make his call at the end of the interview.

11. The defendant's right to Confrontation as guaranteed by the Sixth Amendment of the United States Constitution and the New Jersey Constitution of 1947, and the defendant's right to due process that is guaranteed by the Fourteenth Amendment of the United States Constitution was violated when the trial court denied the defendant's motion to obtain the police records of the state['] s witnesses when the defendant produced evidence that one of the officer's in his case ha[d] forged a judge['] s signature on a search warrant in another case and that there were other officer[]s in the defend[an]t's case that w[ere] under investigation.

(ECF No. 1.)

Respondents submitted an Answer in which they argue that Petitioner's claims are meritless. (ECF No. 7.) Petitioner submitted a reply, relying on his briefs submitted to the state courts. (ECF No. 9.)

## III.    LEGAL STANDARD

Under 28 U.S.C. § 2254(a), the district court "shall entertain an application for a writ of habeas corpus [o]n behalf of a person in custody pursuant to the judgment of a State court only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States." A habeas petitioner has the burden of establishing his entitlement to relief for each claim presented in his petition based upon the record that was before the state court. *See Eley v. Erickson*, 712 F.3d 837, 846 (3d Cir. 2013); *see also Parker v. Matthews*, 567 U.S. 37, 40–41 (2012). District courts are required to give great deference to the determinations of the state trial and appellate courts. *See Renico v. Lett*, 559 U.S. 766, 773 (2010).

Where a claim has been adjudicated on the merits by the state courts, the district court shall

not grant an application for a writ of habeas corpus unless the state court adjudication

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d)(1)–(2). Federal law is clearly established for these purposes where it is clearly

expressed in "only the holdings, as opposed to the dicta" of the opinions of the United States

Supreme Court. *See Woods v. Donald*, 135 S. Ct. 1372, 1376 (2015). "When reviewing state

criminal convictions on collateral review, federal judges are required to afford state courts due

respect by overturning their decisions only when there could be no reasonable dispute that they

were wrong." *Id.* Where a petitioner challenges an allegedly erroneous factual determination of

the state courts, "a determination of a factual issue made by a State court shall be presumed to be

correct [and the] applicant shall have the burden of rebutting the presumption of correctness by

clear and convincing evidence." 28 U.S.C. § 2254(e)(1).

Under these standards, the relevant state court decision that is appropriate for federal

habeas corpus review is the last reasoned state court decision. *See Bond v. Beard*, 539 F.3d 256,

289–90 (3d Cir. 2008). Additionally, these standards apply "even where there has been a summary

denial" by the state court. *Cullen v. Pinholster*, 563 U.S. 170, 187 (2011). "In these circumstances,

[petitioner] can satisfy the 'unreasonable application' prong of § 2254(d)(1) only by showing that

'there was no reasonable basis' for the [state court's] decision." *Id*. at 187–88 (quoting *Harrington

v. Richter*, 562 U.S. 86, 98 (2011)). Furthermore, "when the relevant state-court decision on the

merits . . .does not come accompanied with . . . reasons . . . [w]e hold that the federal court should

'look through' the unexplained decision to the last related state-court decision that does provide a relevant rationale." *Wilson v. Sellers*, 138 S. Ct. 1188, 1192 (2018).

## IV.    DISCUSSION

### A.  Ground One: Search and Seizure

In Ground One, Petitioner contends that he was unlawfully searched and that the search incident to his arrest was unlawful.  (ECF No. 1 at 5.)

The Fourth Amendment bars "unreasonable searches and seizures."  U.S. Const. amend. IV.  Generally, evidence gained through a Fourth Amendment violation may not be used against a defendant at trial.  *See Mapp v. Ohio*, 367 U.S. 643, 654–55 (1961); *Weeks v. United States*, 232 U.S. 383, 391–93 (1914).  This "exclusionary rule" is a judicially-created remedy to safeguard Fourth Amendment rights by deterring police conduct that violates those rights.  *Stone v. Powell*, 428 U.S. 465, 486 (1976).  With respect to collateral review, however, the Supreme Court has found that the costs of the exclusionary rule outweigh its benefits.  Therefore,

> 'where the State has provided an opportunity for full and fair litigation of a Fourth Amendment claim, a state prisoner may not be granted federal habeas corpus relief on the ground that evidence obtained in an unconstitutional search or seizure was introduced at his trial.'  [*Stone*, 428 U.S. at 494.]  While the federal courts are not thus deprived of jurisdiction to hear the claim, they are—for prudential reasons—restricted in their application of the exclusionary rule.

*Marshall v. Hendricks*, 307 F.3d 36, 81 (3d Cir. 2002), *cert. denied*, 538 U.S. 911 (2003).

Here, Petitioner was afforded a full and fair opportunity to litigate his Fourth Amendment claim in the form of a motion to suppress the evidence seized by the arresting officers (ECF No. 7-13), as well as raising it on direct appeal.  Accordingly, this Court will not grant federal habeas relief on this claim.

**B. Ground Two: Grandy Jury Indictment**

In Ground Two, Petitioner argues that the state court erred in denying his motion to dismiss the indictment. (ECF No. 1 at 8.) In support of his argument, Petitioner alleges that the grand jury testimony consisted of hearsay evidence and that the indictment number was incorrect. (*Id.*)

The Appellate Division rejected this claim as follows:

> Potter argues that the indictment should have been dismissed because it was based on hearsay evidence [and] the indictment number was incorrectly transcribed . . . [t]he motion judge correctly rejected those contentions.
>
> A grand jury indictment is presumed valid and should only be disturbed if manifestly deficient or palpably defective, *Ramseur, supra*, 106 N.J. at 232, based on the 'clearest and plainest ground,' *State v. Perry*, 124 N.J. 128, 168 (1991) (quoting *State v. N.J. Trade Waste Ass'n*, 96 N.J. 8, 18–19 (1984)). [A]n indictment should not be dismissed unless the prosecutor's error was clearly capable of producing an unjust result. This standard can be satisfied by showing that the grand jury would have reached a different result but for the prosecutor's error. *State v. Hogan*, 336 N.J. Super. 319, 344 (App. Div.), *certif. denied*, 167 N.J. 635 (2001). A discrepancy in a date stamp or other similar clerical error will not invalidate an indictment. *State v. Unsworth*, 85 N.J.L. 237, 238 (E.A. 1913). As we explained in *State v. Holsten*, '[a]n indictment may be based largely or wholly on hearsay and other evidence which may not be legally competent or admissible at the plenary trial.' 223 N.J. Super. 578, 585 (App. Div. 1988) (alteration in original) (quoting *State v. Schmidt*, 213 N.J. Super. 576, 584 (App. Div. 1986), *rev'd on other grounds*, 110 N.J. 258 (1988)); *see also State v. McCrary*, 97 N.J. 132, 146 (1984) (stating that hearsay and other informal proofs are permissible in determining issues that implicate important rights, such as the bases for an indictment (citing *Costello v. United States*, 350 U.S. 359, 363, 76 S. Ct. 406, 408, 100 L. Ed. 397, 402–03, *reh'g denied*, 351 U.S. 904, 76 S. Ct. 692, 100 L. Ed. 1440 (1956)); *State v. Vasky*, 218 N.J. Super. 487, 491 (App. Div. 1987) (A grand jury may return an indictment based largely or wholly on hearsay testimony.). Where there is sufficient evidence to sustain the grand jury's charges, the indictment should not be dismissed. *See Holsten, supra*, 223 N.J. Super. at 585–86.

*Potter*, 2015 WL 3843309, at *15.

Deficiencies in state grand jury proceedings are generally not grounds for relief in § 2254 habeas proceedings. *See, e.g.*, *Lopez v. Riley,* 865 F.2d 30, 32 (2d Cir. 1989) (relying on *United States v. Mechanik,* 475 U.S. 66 (1986)). To determine whether "an otherwise fair trial remedies errors not occurring at the trial itself . . . . [courts must inquire] whether the trial cured the particular error at issue." *See Lafler v. Cooper,* 566 U.S. 156, 165 (2012). Here, the Court finds that the trial testimony cured any alleged hearsay testimony at the grand jury proceeding. The record establishes that Officer Raisin testified during the grand jury proceeding about matters he observed and matters Officer Warraich and Detective Snowden described to him. (ECF No. 7-11). At trial, Raisin, Warraich and Snowden had the opportunity to testify and were cross-examined. (ECF Nos. 7-20, 7-21.) Thus, any potential errors related to hearsay testimony during the grand jury proceeding were cured at the subsequent trial, which resulted in a guilty verdict. *See United States v. Console*, 13 F.3d 641, 672 (3d Cir. 1993) (with the exception of a claim of racial discrimination in the selection of grand jurors, a "petit jury's guilty verdict render[s] any prosecutorial misconduct before the indicting grand jury harmless.") (citing *Vasquez v. Hillery*, 474 U.S. 254 (1986)); *see also Brewer v. D'Ilio*, 14-6886, 2018 WL 878529, at \*5 (D.N.J. Feb. 14, 2018) (finding that "indictments may be returned on hearsay") (citing *Pittsburgh Plate Glass Co. v. United States*, 360 U.S. 395, 400 (1959)).

Petitioner also argues that the indictment number was improperly transcribed. With respect to the indictment itself, the document contains no indictment number, but only a case number. (ECF No. 7-3 at 77.) It does, however, contain Petitioner's full name, the date of the charges against him, and the elements of each offense. (*Id*.) Thus, Petitioner was, or should have been, aware of the specific charges pending against him based on that document. "In determining whether the notice in an indictment is sufficient to afford a defendant due process, the question is

whether under the circumstances there was reasonable notice and information of the specific charge against him and a fair hearing in open court." *Bibby v. Tard*, 741 F.2d 26, 29 (1984) (citing *Paterno v. Lyons*, 334 U.S. 314, 320 (1948)). The indictment certainly put Petitioner on notice of the specific charges against him.

During the hearing on Petitioner's motion to dismiss the indictment, he also explained that various items provided to him in discovery contained the wrong indictment number and the plea offer contained a different defendant's name. (ECF No. 7-17 at 2–3.) To the extent that is true, Petitioner points to no Supreme Court case law, nor is this Court aware of any, that typographical errors in the discovery provided to a defendant could support a constitutional violation sufficient for habeas purposes. Because Petitioner has not shown that the Appellate Division decision on this matter was an unreasonable application of Supreme Court precedent, this claim is denied.

### C. Ground Three: Jury Instructions

In Ground Three, Petitioner contends that the trial judge improperly instructed the jury that a judicial determination had previously been made as to the legality of the stop of Petitioner. (ECF No. 1 at 9.) The Appellate Division summarily rejected this claim. *See Potter*, 2015 WL 3843309, at *12.

The record establishes that after Petitioner's cross-examination of Officer Warraich—which included questions related to the legality of the search and seizure of evidence—the judge explained at sidebar that the issue of search and seizure had already been decided upon at the suppression hearing. The judge stated:

> At some point in time, and it may be at the end of the case, this jury is going to get a charge from me that the search and seizure in this case is not for them to determine. Their sole and exclusive purpose is to determine if this defendant was in possession, possession with intent or possession with intent within a thousand feet of a school of

a controlled substance, to wit, heroin. I just want him [the defendant] to understand that.

(ECF No. 7-20 at 42.)

At the end of the day's proceedings, the judge instructed the jury as follows:

Now, let me explain something to you. Prior to today's proceedings or this trial in this case, there was a determination made, a judicial determination about the search, and the search was determined in this case in a prior proceeding to be legal. So your task in this case, I just want you to understand when you're listening to the testimony, the jury's task in this case is to determine whether this defendant is guilty or not guilty of possession of heroin, possession of that heroin with intent to distribute, and possession of that heroin with intent to distribute within a thousand feet of a school or school property.

The jury is not -- part of your function is not to determine whether or not the search was legal or illegal. That's already been determined. Do you understand what your function is? I've refined the issues in this case.

(*Id.* at 64.)

At the conclusion of trial, the judge instructed the jury similarly:

The issue of the validity of the stop and search of the defendant is not for the jury to decide. Only the issue of guilt or nonguilt of the three counts that I have just outlined in the indictment. That is the jury's task in this case.

(ECF No. 7-23 at 26.)

"It is well-settled that 'the question of the competency of the evidence . . . by reason of the legality or otherwise of its seizure [is] a question of fact and law for the court and not for the jury.'" *United States v. Reed*, 575 F.3d 900, 919 (9th Cir. 2009) (citing *Steele v. United States*, 267 U.S. 505, 511 (1925)); *see also United States v. Gaudin*, 515 U.S. 506, 525–26 (1995) ("Preliminary questions in a trial regarding the admissibility of evidence . . . the legality of searches and seizures . . . may be decided by the trial court.")

13

Here, the legality of the search and seizure was not a question for the jury to consider. Rather, it was a question for the trial court to rule on in the context of the pretrial motion to suppress. Because the judge appropriately instructed the jury as such, the Appellate Division decision denying this claim was not an unreasonable application of Supreme Court precedent. Accordingly, the Court denies relief on this claim.

### D. Ground Four: Improper Jury Instruction

In Ground Four, Petitioner alleges that the trial court improperly instructed the jury on the "quantity requirement for a second degree intent to distribute CDS crime." (ECF No. 1 at 11.) Petitioner provides no support for this argument. In his brief in state court, Petitioner stated that the difference between second-degree and third-degree intent to distribute depends upon the amount intended to be distributed. (ECF No. 7-3 at 21.) He argued that the jury instructions were deficient because they did not require the jury to consider how much of the heroin in Petitioner's possession he intended to keep for himself. (*Id.* at 21–21.)

The Appellate Division denied this claim as follows:

> Potter argues for the first time on appeal that the trial judge erred in failing to charge the jury that it should consider how much of the heroin he intended to keep for his personal use in determining whether he possessed "a quantity of one-half ounce or more with the intent to distribute," as required by N.J.S.A. 2C:35–5(b)(2). Not only did Potter fail to request such a charge, there was no evidence in the record to suggest that he intended to keep any for himself. In fact, in his statement, Potter said that he had two bags of heroin and intended to sell both of them. Consequently, there was no error and, even if there was, the error did not possess "'a clear capacity to bring about an unjust result[.]'" *Adams*, *supra*, 194 N.J. at 207 (quoting *Jordan*, *supra*, 147 N.J. at 422).

*Potter*, 2015 WL 3843309, at *13.

Petitioner's claim in this context appears to rest on matters of state law. The Supreme Court has explained that "[i]t is not the province of a federal habeas court to reexamine state-court

determinations on state-law questions." *Estelle v. McGuire*, 502 U.S. 62, 67–68 (1991). "[T]he fact that [an] instruction was allegedly incorrect under state law is not a basis for habeas relief." *Id.* at 71–72.

Nevertheless, to the extent the claim could be construed as resting on federal law as well, the habeas court must consider "whether the ailing instruction by itself so infected the entire trial that the resulting conviction violates due process [under the Fourteenth Amendment] . . . not merely whether the instruction is undesirable, erroneous, or even universally condemned." *Henderson v. Kibbe*, 431 U.S. 145, 154 (1977) (internal citations and quotations omitted). A habeas petitioner must establish that the instructional error "had [a] substantial and injurious effect or influence in determining the jury's verdict." *Brecht v. Abrahamson*, 507 U.S. 619, 637 (1993). Further, it is "well established" that instructions "may not be judged in artificial isolation," but must be viewed in the context of the overall charge and the trial record. *Cupp v. Naughton*, 414 U.S. 141, 146 (1973).

The state court determination on this matter was not objectively unreasonable. The judge instructed the jury on the quantity requirement of possession with intent to distribute, as follows:

> Now, as I indicated to you, there's a supplemental question under Count 2 concerning the weight. If you have found the defendant guilty of possession with intent to distribute, and that's the predicate question you will see on the verdict sheet, you must then determine the quantity of the heroin involved. It is the State's burden to prove beyond a reasonable doubt the quantity of heroin involved. The State need not prove the defendant's knowledge of the quantity of the drugs so long as it proves beyond a reasonable doubt that the defendant knowingly possessed the controlled, dangerous substance. You may aggregate the controlled, dangerous substance when you find that separate amounts of the controlled, dangerous substance were obtained and/or possessed by the defendant. If you determine that the CDS, that is controlled, dangerous substance, was obtained or possessed by the defendant, the weight amounts may be added together to form a single total.

. . .

> Specifically you must determine which one of the following quantities has been proven. This is the supplemental question. One half ounce or more, including any adulterants or dilutants; or less than one half ounce of heroin, including adulterants or dilutants. After determining which of these quantities the State has proven beyond a reasonable doubt, you should mark the appropriate section of the verdict sheet, which would be supplied to you.

(ECF No. 7-23 at 29–30.)

The judge also instructed the jury on the offense of possession of heroin with intent to distribute by reciting the New Jersey statute and reiterating and defining the elements involved. (ECF No. 7-23 at 27–29.) Specifically, the judge defined the term distribute: "distribute means to transfer, actual, constructive, or attempted from one person to another…" (*Id.* at 28.) The jury was therefore aware that it was the State's burden to prove that the quantity of heroin involved—more or less than one half ounce—was physically transferred to the person of another. Thus, there is no ambiguity in the instruction in the manner described by Petitioner.

Furthermore, as indicated by the Appellate Division and established by the record, there was no evidence to suggest that Petitioner intended to keep any of the heroin for himself. In his redacted statement to the police, which was played for the jury, Petitioner explained that he was told to pick up the seventeen bricks of heroin and deliver it to two individuals. (ECF No. 7-5 at 102.) Petitioner explained that he was paid for his delivery and he used the money for food and to earn extra cash. (*Id.* at 103.) Because Petitioner fails to argue that the jury verdict was based on an erroneous jury instruction or an erroneous factual determination, the Court denies relief on this claim.

### E. Ground Five: Confrontation Clause

Petitioner argues that his constitutional rights were violated when the State presented evidence that he was under surveillance. (ECF No. 1 at 13.) He explains that this violated his rights under the Confrontation Clause, and improperly highlighted prior crimes he allegedly committed. (*Id.*)

The Appellate Division rejected this claim as follows:

> Potter also argues for the first time on appeal that the State improperly introduced, through testimony that Potter was under surveillance at the time of his arrest, evidence of other crimes in violation of N.J.R.E. 404(b) and *State v. Cofield*, 127 N.J. 328, 338 (1992). Samis testified on direct that there was a surveillance set up on Potter. There was no objection. On cross-examination, when Potter asked Samis why he was under surveillance, Samis responded that they had received information from a confidential informant. Potter did not object to that testimony either, and in fact it was his cross-examination of Samis that invited the mention of the informant. In addition, he never requested a limiting instruction. Although we question whether mention of the surveillance, or the informant, in response to Potter's own question, actually raises an issue under *Cofield*, we are convinced that the testimony at issue does not raise "'a reasonable doubt as to whether the error led the jury to a result it otherwise might not have reached,'" *Taffaro*, *supra*, 195 N.J. at 454 (quoting *Macon*, *supra*, 57 N.J. at 336).

*Potter*, 2015 WL 3843309, at *13.

In their Answer, Respondents argue that Petitioner invited the error upon himself. (ECF No. 7 at 29.) The Court agrees.

The record establishes that throughout the trial Petitioner questioned various officers about the confidential informant ("CI") who provided them with information on Petitioner's sale of drugs. Petitioner's standby counsel objected, stating that this information was hearsay. (ECF No. 7-20 at 30.) The trial judge responded that he would not protect Petitioner from himself, because it was Petitioner who raised the subject of the CI. (*Id.*) Petitioner then continued to question the

officers about the information they received from the CI.  For example, on cross-examination of

Officer Warraich, Petitioner questioned:

> Q:    Now, you stated that there was information, that you received information from Officer Raisin that I would be transporting a large amount of heroin?
>
> A:    Yes.
>
> Q:    And where did that information come from?
>
> A:    That you have to ask Officer Raisin.
>
> Q:    He didn't tell you where he got the information from?
>
> A:    We may have discussed, yeah, but it's confidential informant.
>
> Q:    A confidential informant?
>
> A:    Yes.

(ECF No. 7-20 at 31.)

Similarly, on cross-examination of Detective Samis, Petitioner questioned:

> Q:    In this report you state that on April 26, 2010, during the evening hours that you met with a confidential informant who had been proven reliable in the past in reference to narcotics.  The CI advised you that during the morning hours a man known to the CI as Eric Potter would walk from the area of the Vita Gardens area through the Asbury Park Middle School basketball court, north on Comstock Street to 1042 Bangs Avenue, where he would distribute a quantity of heroin during the day.
>
> The CI stated that Potter would play poker on the second floor with other subjects and distribute the CDS while at that location.  The CI described Potter as a black male, early 50's, approximately 5 [feet], 6 inches tall, thin build, brown skin.
>
> . . .
>
> Q:    Is that correct?  Is that report correct?
>
> A:    Yes.

Q:	That's the information that the CI provided you?

A:	Yes.

Q:	And you're sure?

A:	Yes.

(ECF No. 7-20 at 56.)

When the State later questioned Detective Samis about events prior to Petitioner's arrest, Detective Samis testified that the officers "set up surveillance on Mr. Potter . . ." (ECF No. 7-21 at 10.) In his brief before the Appellate Division, Petitioner took issue with Detective Samis' statement, arguing that his rights under the Confrontation Clause were violated because he could not question the confidential informant. (ECF No. 7-3 at 32–36.) He also argued that the statement indicated to the jury that he had committed prior bad acts, which was the reason he was under surveillance. (*Id.*)

The doctrine of invited error prevents a habeas petitioner from raising a claim challenging an action of the trial court which was invited or induced by that petitioner. *See, e.g.*, *United States v. Maury*, 695 F.3d 227, 256 (3d Cir. 2012). This doctrine provides an independent basis for this Court to reject claims raised in § 2254 habeas matters. *See, e.g.*, *York v. O'Llio*, No. 13-7609, 2016 WL 5938700, at *10–11 (D.N.J. Oct. 11, 2016).

Here, the exchanges that occurred in the trial court proceedings cited above unquestionably demonstrate that it was Petitioner who invited the error upon himself. He repeatedly questioned the officers about the confidential informant; when Petitioner's standby counsel raised concerns, Petitioner continued his line of questioning. "Indeed, because Petitioner . . . consented to and approved of the course of action taken . . . he cannot [now] cry foul as to the action in question."

*Saunders v. D'Illio*, No. 15-2683, 2018 WL 1251629, at *9 (D.N.J. Mar. 12, 2018) (internal quotation marks and citation omitted). Therefore, this claim must be denied.

With respect to the prior bad acts, this Court is not aware of any Supreme Court case clearly establishing that bad acts evidence constitutes a violation of federal constitutional rights. *See, e.g.*, *Minett v. Hendricks*, 135 F. App'x 547, 553 (3d Cir. 2005) (rejecting claim that admission of "other crimes" evidence is contrary to or an unreasonable application of clearly established Supreme Court precedent); *see also Charlton v. Franklin*, 503 F.3d 1112, 1115 (10th Cir. 2007) (state court's admission of evidence of petitioner's prior bad acts did not render trial fundamentally unfair or warrant habeas relief). Moreover, no bad acts were ever referenced by Detective Samis. Instead, Detective Samis only stated that Petitioner was under surveillance and the Court does not find convincing Petitioner's suggestion that surveillance of a suspect equates to that suspect having committed bad acts. Because Petitioner fails to demonstrate he is entitled to relief, this claim is denied.

### F. Ground Six: Prosecutorial Misconduct

Petitioner next argues that prosecutorial misconduct occurred when the prosecutor stated that Petitioner was engaged in a continuing criminal enterprise. (ECF No. 1 at 13.) In state court, Petitioner pointed to the State's summation to support this claim, wherein the prosecutor stated, "you can basically see a business model for this defendant." (ECF No. 7-23 at 12.)

The Appellate Division rejected this claim as follows:

> Potter contends for the first time on appeal that the prosecutor improperly stated in closing argument that Potter was engaged in an ongoing criminal enterprise. The prosecutor argued to the jury that "you can basically see a business model for this defendant." In the absence of an objection, [such] remarks usually will not be deemed prejudicial. *State v. Ramseur*, 106 N.J. 123, 322–23 (1987). The failure to object suggests that the defendant did not believe the remarks were prejudicial at the time they were made and deprives

the court of an opportunity to take curative action. *State v. Bauman*, 298 N.J. Super. 176, 207 (App. Div.), *certif. denied*, 150 N.J. 25 (1997). In any event, the prosecutor's argument was a fair comment on that portion of Potter's statement to the police in which he said that he obtained drugs from a supplier and sold the drugs for profit. He also told them that he used the money derived from the transactions to support himself.

*Potter*, 2015 WL 3843309, at *14.

The Supreme Court has explained that a prosecutor's arguments on summation will only result in a constitutional violation if "the argument rendered the trial unfair." *Darden v. Wainwright*, 477 U.S. 168, 179 (1986). "[I]t is not enough that the prosecutors' remarks were undesirable or even universally condemned. . .[t]he relevant question is whether the prosecutors' comments so infected the trial with unfairness as to make the resulting conviction a denial of due process." *Id.* at 181 (internal citations and quotation omitted).

The Appellate Division decision on this matter was neither contrary to nor an unreasonable application of Supreme Court law. Given Petitioner's recorded statement to the police—in which he stated that he sold the drugs for a profit and used the money to buy food and earn extra cash—Petitioner's argument that the prosecutor's statement rendered the trial unfair has no merit. Instead, by his own admission, Petitioner did appear to be engaged in a criminal enterprise. Furthermore, even had Petitioner objected to the statement and the judge deemed the statement improper, there was still ample evidence of Petitioner's guilt. Petitioner gave a detailed confession to the police and various officers observed Petitioner with the heroin in his pockets. More importantly, the jury instructions at the conclusion of trial instructed the jury not to consider the State and defense counsel's summation as evidence. (ECF No. 7-23 at 21.) The jury is presumed to have followed this instruction. *See Weeks v. Angelone*, 528 U.S. 225, 234 (2000). Accordingly, Petitioner fails to show he is entitled to relief on this claim.

### G. Ground Seven: Expert Witness Testimony

Petitioner next argues that an expert witness, Detective Snowden, improperly rendered a conclusion that usurped the jurors' responsibility to determine the facts. (ECF No. 1 at 14); (ECF No. 3 at 45).

The Appellate Division denied this claim, explaining:

> Potter also asserts for the first time on appeal that expert testimony in this case was improper because the expert opined that the heroin was possessed with the intent to distribute. Such testimony is specifically permitted by the Supreme Court, which held in *State v. Sowell*, 213 N.J. 89, 103–05 (2013) that ordinary jurors cannot be expected "to understand the difference between drugs possessed for distribution as opposed to personal use." In any event, Potter admitted in his statement to the police that he had the heroin with him because he intended to sell it.

*Potter*, 2015 WL 3843309, at *14.

To the extent Petitioner is arguing that the state court erred as a matter of state law in permitting Detective Snowden to provide this testimony, this argument is not proper for federal habeas review. *See Marshall v. Lonberger*, 459 U.S. 422, 438 n.6 (1983) ("the Due Process Clause does not permit the federal courts to engage in a finely-tuned review of the wisdom of state evidentiary rules"); *Wilson v. Vaughn*, 533 F.3d 208, 213 (3d Cir. 2008) ("[a]dmissibility of evidence is a state law issue") (citing *Estelle*, 502 U.S. at 72).

Nevertheless, to the extent this can be raised as a due process violation, a state court's evidentiary decision must have been so arbitrary or prejudicial that it rendered the trial fundamentally unfair. *See Romano v. Oklahoma*, 512 U.S. 1, 12–13 (1994); *see also Keller v. Larkins*, 251 F.3d 408, 413 (3d Cir. 2001) (evidentiary error rises to the level of a Due Process violation only when "it was of such magnitude as to undermine the fundamental fairness of the entire trial"). Courts have held that the appropriateness of expert witness testimony is analyzed

under this same standard. *See Beltran v. Hastings*, No. 12-2042, 2014 WL 1665727, at \*12–17 (D.N.J. Apr. 24, 2014) (analyzing the appropriateness of expert testimony on habeas review under the standard for evidentiary error); *see also Dandor v. Ricci*, No. 09-1565, 2011 WL 735065, at \*16 (D.N.J. Feb. 22, 2011) (finding on habeas review that expert testimony was not improper because the testimony did not violate fundamental fairness). The United States Supreme Court has "defined the category of infractions that violate fundamental fairness very narrowly." *Dowling v. United States*, 493 U.S. 342, 352 (1990) (internal quotations omitted).

The record establishes that Detective Snowden testified for the State as an expert in narcotics distribution. (ECF No. 7-21 at 45.) He described how heroin is generally packaged and the cost of purchasing various quantities. (*Id.* at 45–48.) He then testified that he reviewed the police reports and lab reports in Petitioner's case. (*Id.* at 48.) The State then asked, "[n]ow, in your opinion, the possession of 850 bags of heroin in conjunction with the possession of $1500 in cash, is that indicative of possession of heroin with the intent to use it yourself or with the intent to distribute the heroin?" (*Id.* at 48.) Detective Snowden responded, "[t]hat would be with the intent to distribute." (*Id.*) On cross-examination, Petitioner asked Detective Snowden: "And you can't say for sure whether or not the drugs was for distribution or use or not, or anything like that, that's just your opinion then?" (*Id.*) Snowden responded: "Well, it's my opinion. I have never seen an addict have 17 bricks of heroin on him." (*Id.*)

The Appellate Division decision rejecting this claim was not unreasonable. There is nothing to indicate that Detective Snowden's testimony rendered the trial fundamentally unfair. Snowden was accepted as an expert witness and he rendered an opinion based on the facts presented to him. He made clear that it was only his opinion; the jury was never instructed that they must accept his opinion as fact. Moreover, at the conclusion of trial, the judge instructed the

jury that they were "not bound" by the expert's opinion but may "consider" it or "reject it." (ECF No. 7-23 at 23–24.) Because the alleged violation does not violate clearly established federal law, Petitioner is denied relief on this claim.

## H. Ground Eight: Prejudicial Testimony

In his next ground for relief, Petitioner argues that the trial court allowed a witness to provide false testimony—that Petitioner was dealing drugs day and night. (ECF No. 1 at 14.) The Appellate Division rejected this claim as meritless without further discussion. *Potter*, 2015 WL 3843309, at *12.

The record reveals that portions of the taped statement made by Petitioner to Detective Samis were redacted, and only the redacted version was played for the jury. (*See* ECF No. 7-21 at 11.) At trial, Detective Samis testified for the State. On cross-examination, Petitioner questioned Detective Samis about a portion of the statement that had previously been redacted. (ECF No. 7-21 at 19.) Petitioner questioned Detective Samis as follows:

> Q:     Okay. Now, in this video statement, I mean, the statement, you stated, "I mean, we been out in the morning pretty much. That area has been a lot of complaints and a lot of activity. You been there a lot lately, and that's why you came up on the radio. I mean, this is something that you just been doing all day and night or have been slowing it down, or just selling as much as you can trying to get on your feet."
>
>         Now, what do you mean by "you been out there a lot in the morning lately"?

(ECF No. 7-21 at 19.)

At that point, the State objected, and argued at sidebar that this portion of the recorded statement had been stricken. (*Id.*) Petitioner's standby counsel responded that it had not been stricken at Petitioner's request. (*Id.*) The Court responded that he would permit Petitioner to question Detective Samis on the matter, stating: "[y]ou know what? I took things out at his request.

If he puts them back in, then on rebuttal they got a right to rehabilitate that statement.  He can do whatever he wants, but I'm not protecting him from himself."  (*Id.*)

Petitioner then proceeded with his questioning of Detective Samis:

> Q:    Now, you said that area that you had a lot of complaints and a lot of activity, and that I been out there a lot lately.  What did you mean by that?
>
> A:    By that statement, Mr. Potter?
>
> Q:    By that statement you said?
>
> A:    When you're dealing with confidential informants with investigations like this, with narcotics, of course it brings a lot of danger to situations.  We didn't want Mr. Potter to be aware that there was a confidential informant that was used in this case.  So I was letting Mr. Potter know that we had been out there and seen him so he didn't think that a person could have told on him or possibly that individual, the confidential informant could get hurt.  So that was a ruse, Mr. Potter, just to make you feel comfortable that possibly we were watching you instead of a confidential informant was used.
>
> Q:    So basically it was a lie?
>
> A:    It was a ruse.

(*Id.* at 20.)

As noted previously by this Court, state court evidentiary rulings are generally not proper for federal habeas review.  *See Lonberger*, 459 U.S. at 438 n.6.  Instead, a state evidentiary decision will rise to the level of a due process violation only where it rendered the trial fundamentally unfair.  *See Romano*, 512 U.S. at 12–13.  Here, there is nothing to indicate that the judge's decision allowing Petitioner to proceed with his questioning of Detective Samis rendered the trial fundamentally unfair.  The record makes clear that it was Petitioner himself who chose to put this information before the jury, not the judge or the State.  This portion of the recorded statement had

been redacted. There was a discussion at sidebar about that fact, but Petitioner still chose to continue questioning Detective Samis on the topic.

Furthermore, to the extent the testimony was improper, the excerpts above make clear that it was Petitioner who invited the error upon himself. Thus, he cannot challenge this testimony now on habeas review. *See Maury*, 695 F.3d at 256. Lastly, in his state court brief, Petitioner argued that he was prejudiced by "Samis' allegation that the defendant had been selling drugs day and night." (ECF No. 7-3 at 54.) This, however, is not accurate. Detective Samis specifically stated on the record that it was a ruse and was not true. For these reasons, this claim for relief is denied.

## I. Ground Nine: Lay Witness Testimony

In Ground Nine, Petitioner argues that he was prejudiced by Officer Warraich's testimony, when the Officer stated that he believed what was inside Petitioner's pocket was heroin. (ECF No. 1 at 14.) In his state court brief, Petitioner elaborated that Warraich "improperly provided substantive evidence that it was all heroin," when, in fact, only a portion of the evidence seized was tested by a chemist. (ECF No. 7-3 at 57.)

The Appellate Division rejected this claim, stating:

> We also find no reason to reverse on the basis of Warraich's testimony to his belief that the plastic bag in Potter's pocket contained heroin, testimony to which there was no objection. Although Warraich had not been qualified as an expert, his testimony was not offered to prove that the bags contained heroin, but rather offered to show why he arrested Potter. The State called a qualified expert to testify to her analysis of a portion of the contents of the bags seized from Potter, which established that there was more than one half of an ounce of heroin. The testimony at issue does not raise "'a reasonable doubt as to whether [any] error led the jury to a result it otherwise might not have reached,'" *Taffaro*, *supra*, 195 N.J. at 454 (quoting *Macon*, *supra*, 57 N.J. at 336).

*Potter*, 2015 WL 3843309, at *14.

The transcripts of the trial proceeding revealed that Officer Warraich testified that when he approached Petitioner he "observed CDS, heroin" in Petitioner's front jacket pocket. (ECF No. 7-20 at 26.) He further explained that he observed "[a] clear plastic bag containing [what] I believed to be bricks of heroin." (*Id.* at 27.) On cross-examination the Officer testified that the heroin was "wrapped up in paper." (*Id.* at 32.) Petitioner then asked:

> Q:    So how do you know what was inside the paper?
>
> A:    I don't.  But that's how heroin is -- from my training and experience, I've never seen anything else wrapped up in it. . . . And with the information that we already had, it was quite obvious to me that that's what it was.

(*Id.*)

Once again, to the extent Petitioner is arguing that the trial court erred under state law in permitting Officer Warraich to provide this testimony, this claim is not proper for federal habeas review. *See Lonberger*, *supra*, 459 U.S. at 438 n.6.  In fact, in his brief in state court, Petitioner cited only to New Jersey law to support his argument that this was beyond the realm of lay witness testimony. (ECF No. 7-3 at 56–60.)  As such, this claim is not proper for federal habeas review.

Nevertheless, even if this claim can be construed as containing a federal element, Petitioner has not shown how this testimony rendered the trial fundamentally unfair. *See Romano*, 512 U.S. at 12–13.  The State provided testimony from Lorraine Kazenmayer, an expert in the analysis of controlled and dangerous substances.  She verified that she tested a sampling of the evidence which was found to be heroin. (ECF No. 7-21 at 34–35.)  Kazenmayer testified that the heroin weighed more than one-half ounce in total. (*Id.* at 34–35.)  Kazenmayer also stated that while she did not test all the powder in the 500 glassine envelopes, she used the lab's statistical method to determine how much to test to cover the full amount of evidence. (*Id.* at 33, 37.)  Thus, the fact that the

glassine envelopes contained heroin, was verified by an expert witness and was not solely based on the opinion testimony of Warraich. Because Petitioner has not shown that the Appellate Division's rejection of this claim was unreasonable, this claim is denied.

## J. Ground Ten: *Miranda* Rights

In Ground Ten, Petitioner contends that the State failed to prove beyond a reasonable doubt that he waived his *Miranda* rights. (ECF No. 1 at 15.) In support of his claim, he states that he was deprived of an opportunity to consult with an attorney or make a phone call during the interview. (*Id.*)

The Appellate Division denied this claim as follows:

> We now turn to the *Miranda* issue. A trial judge will admit a confession into evidence only if the State has proven beyond a reasonable doubt, based on the totality of the circumstances, that the suspect's waiver of those rights was knowing, intelligent, and voluntary. *State v. Patton*, 362 N.J. Super. 16, 42 (App. Div.), *certif. denied*, 178 N.J. 35 (2003). In reviewing a trial judge's ruling on a *Miranda* motion, we analyze police-obtained statements using a "searching and critical" standard of review to ensure that constitutional rights have not been trampled upon. *Patton*, *supra*, 362 N.J. Super. at 43 (citations and internal quotation marks omitted). We generally will not "engage in an independent assessment of the evidence as if [we] were the court of first instance," *State v. Locurto*, 157 N.J. 463, 471 (1999), nor will we make conclusions regarding witness credibility, *State v. Barone*, 147 N.J. 599, 615 (1997). Instead, we generally defer to the trial judge's credibility findings. *State v. Cerefice*, 335 N.J. Super. 374, 383 (App. Div. 2000).
>
> A suspect's confession during a custodial interrogation can only be obtained if that suspect was supplied with his or her *Miranda* rights. *Miranda*, *supra*, 384 U.S. at 461, 86 S. Ct. at 1620–21, 16 L.Ed.2d at 716. Before considering the validity of a waiver of *Miranda* rights, it must be established that the police scrupulously honored the suspect's right to remain silent. *State v. Burno–Taylor*, 400 N.J. Super. 581, 589 (App. Div. 2008). If the suspect's words or conduct, upon being advised of his or her rights, "could not reasonably be viewed as invoking the right to remain silent," this requirement is

> satisfied and the police may continue their questioning. *Id.* at 590
> (citing *State v. Bey*, 112 N.J. 123, 136–38 (1988)).
>
> The trial judge determined, by the required standard, that the State
> had demonstrated that Potter had freely and voluntarily waived his
> *Miranda* rights after they had been appropriately explained to him.
>
> . . .
>
> On appeal, Potter argues for the first time that he was denied the
> opportunity to seek the advice of counsel over the telephone. There
> is no evidence in the record to support that claim. The fact that
> Samis told Potter at the end of the interview that he could make
> telephone calls once they found out what his bail was does not
> support Potter's claim.

*Potter*, 2015 WL 3843309, at *10–11.

The Fifth Amendment provides that no person "shall be compelled in any criminal case to

be a witness against himself." U.S. Const. amend. V. The Fourteenth Amendment incorporates

the Fifth Amendment privilege against self-incrimination. *See Malloy v. Hogan*, 378 U.S. 1, 8

(1964). In *Miranda v. Arizona*, the United States Supreme Court held that "without proper

safeguards the process of in-custody interrogation . . . contains inherently compelling pressures

which work to undermine the individual's will to resist and to compel him to speak where he would

not otherwise do so freely." 384 U.S. 436, 467 (1966). Pursuant to *Miranda* and its progeny,

"suspects interrogated while in police custody must be told that they have a right to remain silent,

that anything they say may be used against them in court, and that they are entitled to the presence

of an attorney, either retained or appointed, at the interrogation." *See Thompson v. Keohane*, 516

U.S. 99, 107 (1995) (citing *Miranda*, 384 U.S. at 444).

"When police ask questions of a suspect in custody without administering the required

warnings, *Miranda* dictates that the answers received be presumed compelled and that they be

excluded from evidence at trial in the State's case in chief." *Oregon v. Elstad*, 470 U.S. 298, 317

(1985). Conversely, a waiver of the right to remain silent renders self-incriminating, inculpatory statements admissible, and such waiver may be made orally, in writing, or even implied by the interrogated person's conduct. *See North Carolina v. Butler*, 441 U.S. 369, 374–376 (1979). Correspondingly, a trial court can properly admit a defendant's inculpatory statements if the court finds that the government met its preponderance-of-the-evidence burden of showing that the statements were made with a valid waiver of *Miranda* rights. *See Colorado v. Connelly*, 479 U.S. 157, 168–69 (1986).

The question of whether the waiver at issue was "valid" is resolved on a case-by-case basis. Under *Miranda*, a waiver is valid if it is made "voluntarily, knowingly and intelligently." *Miranda*, 384 U.S. at 475. In determining whether there has been a valid waiver of *Miranda* rights, a court must conduct a two-part inquiry ensuing from the "totality of the circumstances" test. *See Moran v. Burbine*, 475 U.S. 412, 421 (1986). First, the court looks to the voluntariness of the waiver statement in order to determine whether the waiver was made "freely," as opposed to being obtained by coercion. *See id.* Second, the court must consider whether the waiver statement was made "knowingly and intelligently," in the sense that the accused was fully aware "both of the nature of the right being abandoned and the consequences of the decision to abandon it." *Id*.

The state courts' application of *Miranda* to the facts of this case was not unreasonable. Petitioner provides virtually no facts to support his contention that the waiver was involuntary. In his brief before the Appellate Division he stated, "[t]he police deprived the defendant of an opportunity to consult with counsel before giving an incriminating confession. Detective Samis conceded that the defendant had asked to make a phone call, but Samis told him that he could make his call after the end of the interview." (ECF No. 7–3 at 72.) These allegations, however, are not corroborated by the record.

The transcript of the recorded confession demonstrates that Detective Samis read Petitioner his *Miranda* rights and Petitioner affirmed that he understood his rights. (ECF No. 7-3 at 87–89.) The transcript also shows that Detective Samis asked Petitioner, more than once, if he understood his rights or needed further explanation. (*Id.*) With respect to Petitioner's third *Miranda* right related to legal representation, Detective Samis stated: "[n]umber three says you have the right to consult with an attorney, before speaking to the police, and you have, and have an attorney present before and during questioning, do you understand that?" (*Id.* at 88.) Petitioner responded, "[y]eah." (*Id.*) At the *Miranda* hearing Detective Samis testified that Petitioner initialed his name next to each *Miranda* right. (ECF No. 7-18 at 6.) At the conclusion of the interview, Detective Samis stated: ". . . we're just waiting, the judges are actually in a judge meeting right now, so we just don't know what it is and we'll let you make phone calls once we find out ok." (*Id.* at 95.) There is nothing in the transcript to indicate that Petitioner requested to speak with an attorney or requested to make a phone call.

On cross-examination, Petitioner questioned Detective Samis about a phone call, and the Detective stated that Petitioner never requested to make a phone call:

> Q:     Detective Samis, on line three it says that you have the right to consult an attorney before speaking to the police and to have an attorney present before and during the questioning. Do you remember whether or not if I asked you for a phone call?
>
> A:     On that specific question, sir?
>
> Q:     No, at any time.
>
> A:     I don't believe so, sir.
>
> Q:     You don't believe so?

> A: I know in the end, sir, that I said I would be able to give you a phone call so if you mentioned to it before that I know I said at the end that I would give you a phone call.

> Q: Do you know if I ever made a phone call or anything?

> A: When I left I'm not sure if you did or you didn't, sir.

(ECF No. 7-18 at 7.)

The state appellate court explicitly rejected the argument that Petitioner was not given an opportunity to make a phone call or consult with an attorney. Having reviewed the record this Court finds that the state courts' factual findings are supported by the record. While Detective Samis could not conclusively recall that Petitioner did not request a phone call, he indicated that he believed Petitioner had not. Because a state court's factual basis for their conclusions are "presumed to be correct" and Petitioner has not shown "by clear and convincing evidence" that those factual conclusions were unreasonable, Petitioner has not met his burden to show he is entitled to relief on this claim. *See* 28 U.S.C. § 2254(e)(1).

### K. Ground Eleven: Police Records

In his final ground for habeas relief, Petitioner argues that his constitutional rights were violated when the trial court denied his motion to obtain police records. (ECF No. 1 at 15.)

The Appellate Division denied this claim, explaining:

> Potter argues that he should have been allowed access to the personnel records of the police officers and detectives who conducted the surveillance. He bases his claim on information given to him by an inmate with whom he spoke while awaiting trial in the Monmouth County Correctional Facility. The allegations had no bearing on the case against Potter and were not factually supported at the time of the motion.

> Although a defendant may attack a prosecution witness's credibility by revealing possible biases, prejudices, or ulterior motives as they relate to the issues in the case, *State v. Harris*, 316 N.J. Super. 384, 397 (App. Div. 1998), the question of whether police personnel

> records should be disclosed involves a balancing between the public
> interest in maintaining the confidentiality of police personnel
> records against a defendant's right of confrontation. *Id.* at 397–98.
> To obtain such records, a defendant must advance 'some factual
> predicate which would make it reasonably likely' that the records
> contain some relevant information, and establish that the defendant
> is not merely engaging in a fishing expedition. *Id.* at 398 (quoting
> *State v. Kaszubinski*, 177 N.J. Super. 136, 139 (Law Div. 1980)).
> The motion judge correctly concluded that Potter failed to meet his
> burden and properly denied his request.

*Potter*, 2015 WL 3843309, at *14.

Petitioner appears to argue here and in state court, that the trial court's denial of this motion violated his rights under the Confrontation Clause. He explains that the police records would have aided him on cross-examination, to impugn the credibility of various officers based on their prior bad acts. (ECF No. 7-4 at 18–26.)

The Confrontation Clause provides that "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him . . . ." U.S. Const. amend. VI. "The right of confrontation . . . means more than being allowed to confront the witness physically. Indeed, [t]he main and essential purpose of confrontation is *to secure for the opponent the opportunity of cross-examinat*ion.'" *Delaware v. Van Arsdall*, 475 U.S. 673, 678 (1986) (internal citations and quotations omitted) (emphasis in original). "[A] criminal defendant states a violation of the Confrontation Clause by showing that he was prohibited from engaging in otherwise appropriate cross-examination designed to show a prototypical form of bias on the part of the witness, and thereby 'to expose to the jury the facts from which jurors . . . could appropriately draw inferences relating to the reliability of the witness.'" *Id.* at 680 (quoting *Davis v. Alaska*, 415 U.S. 308, 318 (1974)).

Application of the above standards reveals that Petitioner was not denied his constitutional rights. The record indicates that the officers identified by Petitioner testified, and each officer was

cross-examined. (*See* ECF Nos. 7-20 through 7-22.). Thus, the testimony of the officers did not implicate the Confrontation Clause. *See California v. Green*, 399 U.S. 149, 162 (1970) ("For where the declarant is not absent, but is present to testify and to submit to cross-examination, our cases, if anything, support the conclusion that the admission of his out-of-court statements does not create a confrontation problem.").

To the extent Petitioner is arguing that he was unable to impeach the officers without the police records, this claim likewise has no merit. The trial judge denied Petitioner's motion to obtain the police records explaining that under New Jersey law it is the moving party's burden to advance a factual predicate for the discovery. (ECF No. 7-14 at 12.) The judge noted that Petitioner supplied no documents or information to support his allegations of bad acts by the officers. (*Id.* at 12.) That factual finding is entitled to deference. *See* 28 U.S.C. § 2254(e)(1). Thus, any argument that the police records would have revealed bad acts with which Petitioner could have impeached the officers, is purely speculative and insufficient to establish that Petitioner's rights under the Confrontation Clause have been violated. For these reasons, the Court denies relief on this claim.

## V.     CERTIFICATE OF APPEALABILITY

Under 28 U.S.C. §2253(c), a petitioner may not appeal from a final order in a habeas proceeding where that petitioner's detention arises out of his state court conviction unless he has "made a substantial showing of the denial of a constitutional right." "A petitioner satisfies this standard by demonstrating that jurists of reason could disagree with the district court's resolution of his constitutional claims or that jurists could conclude that the issues presented here are adequate to deserve encouragement to proceed further." *Miller-El v. Cockrell*, 537 U.S. 322, 327 (2003); *see also Slack v. McDaniel*, 529 U.S. 473, 484 (2000). Because jurists of reason would not

disagree with this Court's conclusion that Petitioner has failed to make a substantial showing of the denial of a constitutional right, Petitioner's habeas petition is inadequate to deserve encouragement to proceed further and a certificate of appealability is denied.

## VI.    CONCLUSION

For the reasons stated above, the Petition for habeas relief is DENIED and Petitioner is DENIED a certificate of appealability.  An appropriate order follows.

Dated: June 29, 2018                              /s/ Freda L. Wolfson
                                                  Freda L. Wolfson
                                                  United States District Judge